# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GERALD M. McLAUGHLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 6906 |
| | ) | |
| | ) | |
| RICHARD CASLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Defendant Richard Casler's (Casler),
Defendant Kenneth Fritz's (Fritz), and Defendant Village of Schaumburg's (Village)
motion for summary judgment. For the reasons stated below, we grant the motion
for summary judgment.

## BACKGROUND

Plaintiff Gerald M. McLaughlin (McLaughlin) alleges that he was employed
by the Village as a Professional Standards Manager in the Village's Office of
Professional Standards (OPS). Casler was allegedly the Director of Police for the
Village and Fritz was allegedly the Village Manager for the Village. McLaughlin

1

alleges that Casler was McLaughlin's direct supervisor and that Fritz was McLaughlin's second-level supervisor. McLaughlin alleges that while he was employed for the Village it was his responsibility to investigate complaints made by private citizens against police officers in the Village. McLaughlin claims that in October 2005, Casler and Fritz proposed that the OPS should be expanded and reorganized to cover all Village employees. However, McLaughlin allegedly had reservations about the consequences of increasing the responsibilities of the OPS. McLaughlin alleges that he expressed these concerns to a Village Trustee (Trustee) and to the Chairman of the Board of Police and Fire Commissioners (Chairman). According to McLaughlin, Casler and Fritz questioned him extensively after they learned that McLaughlin had expressed his concerns about the OPS expansion to the Trustee and the Chairman. McLaughlin claims that on December 8, 2005, Casler informed McLaughlin that his employment was being terminated. Casler allegedly told McLaughlin that he was being fired for making Fritz and Casler "look bad" by expressing his concerns about the OPS expansion to the Trustee and the Chairman. (Compl. Par. 14). McLaughlin alleges that Fritz and Casler had the final authority to terminate McLaughlin and that they used that authority to terminate McLaughlin on behalf of the Village.

McLaughlin filed the instant action and includes claims brought under 42 U.S.C. § 1983 (Section 1983) against all Defendants alleging that Defendants terminated his employment in retaliation for his exercise of his First Amendment rights (Count I), Section 1983 claims against all Defendants alleging violations of his

Due Process rights (Count II), a claim under Illinois state law alleging retaliatory discharge against the Village only (Count III), and claims under Illinois state law for tortious interference with prospective economic advantage brought against Casler and Fritz only (Count IV). Earlier, Defendants filed a partial motion for judgment on the pleadings with respect to the state law claims in Count III and Count IV, which the court granted on XXX. Defendants now bring the instant motion for summary judgment with respect to the remaining claims in Count I and Count II.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In seeking a grant of summary judgment the moving party must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). This initial burden may be satisfied by presenting specific evidence on a particular issue or by pointing out "an absence of evidence to support the non-moving party's case." *Id.* at 325. Once the movant has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings, but, "by affidavits or as otherwise provided for in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e).  A "genuine issue" in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).  The court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party.  *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000).

## DISCUSSION

### I. First Amendment Retaliation Claims Against Casler and Fritz

Defendants argue that Casler and Fritz are entitled to summary judgment on McLaughlin's First Amendment retaliation claims.  A plaintiff can establish a prima facie case for retaliation under the First Amendment by "present[ing] evidence that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action."  *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).  The second and third elements are not in dispute, but Defendants contend that the undisputed evidence shows that McLaughlin's speech was not protected under the First Amendment.

The Seventh Circuit applies the two-prong *Connick-Pickering* test for determining whether speech is protected by the First Amendment. *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007). Under the first prong of the *Connick-Pickering* test, the court asks "whether the employee spoke 'as a citizen on a matter of public concern.'" *Id.* (quoting in part *Spiegla v. Hull*, 371 F.3d 928, 939 (7th Cir. 2004)(*Spiegla I*)). If the employee was speaking as a citizen on matters of public concern, the second prong of the *Connick-Pickering* test "requires a balancing of the employee's interest 'as a citizen in commenting on the matter' against the public employer's interest 'as [an] employer [] in promoting effective and efficient public service.'" *Id.* (quoting in part *Spiegla I*, 481 F.3d at 940). The Supreme Court, in *Garcetti v. Hull*, 547 U.S. 410 (2006), has further clarified that plaintiffs can only prevail on a First Amendment retaliation claim if they were speaking as citizens, not as employees, when they engaged in the speech in question. *Id.* at 421; *Spiegla*, 481 F.3d at 965. Thus, *Garcetti* effectively adds an additional hurdle for plaintiffs to show at the outset, regardless of the content of the speech in question, that the plaintiff was speaking as a citizen and not as a public employee. *Spiegla*, 481 F.3d at 965; *see also Chaklos v. Stevens*, 560 F.3d 705, 711-12 (7th Cir. 2009)(stating that *Garcetti* requires a threshold determination regarding whether the public employee spoke in his capacity as a private citizen or as an employee); *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)(stating that "*Garcetti* . . . requires courts to first decide whether a plaintiff was speaking 'as a citizen' or as part of her public job, before asking whether the subject-matter of particular speech is a topic of public

concern").

Defendants argue that, based on the undisputed facts, McLaughlin was speaking as an employee when he engaged in the speech in question and, thus, cannot withstand the *Garcetti* threshold analysis. Defendants also argue that even if McLaughlin could show he was speaking as a private citizen when he engaged in the speech in question, he cannot survive either prong of the *Connick-Pickering* analysis since the undisputed facts show that his speech was not on a matter of public concern and the Village's interest in promoting an effective chain of command outweighed any personal interest McLaughlin may have had in speaking as a citizen. Finally, Defendants argue that, even if McLaughlin could show that he engaged in protected speech, Casler and Fritz would each be entitled to qualified immunity on McLaughlin's First Amendment retaliation claims since the contours of the law were not sufficiently defined at the time and Casler and Fritz cannot be said to have violated McLaughlin's clearly established constitutional rights.

A. *Garcetti* Threshold Inquiry

As indicated above, the first matter that must be resolved with respect to McLaughlin's First Amendment retaliation claims is whether McLaughlin was acting as a citizen when he engaged in the speech in question. *Chaklos*, 560 F.3d at 711-12. Courts employ a "practical inquiry into what duties the employee is expected to perform, and [such an inquiry] is not limited to the formal job description." *Houskins*, 549 F.3d at 490. Rather, "[t]he controlling factor in the *Garcetti* inquiry is

whether the speech 'owes its existence to a public employee's professional responsibilities.'" *Callahan v. Fermon*, 526 F.3d 1040, 1044 (7th Cir. 2008)(quoting in part *Garcetti*, 547 U.S. at 421).

In this case, construing the facts in a light most favorable to McLaughlin, the particular speech in question consists of a telephone conversation McLaughlin had with the Chairman and an in-person conversation McLaughlin had with the Trustee. (SAF Par. 90-93, 95). Based on McLaughlin's own account of the conversations with the Chairman and the Trustee, both conversations were exclusively on the subject of the proposed expansion and reorganization of the OPS office, of which McLaughlin was the manager. (RSF Par. 30-31, 33-34, 47, 50-51).

According to McLaughlin's version of the events, McLaughlin supported the general concept of the proposed expansion and reorganization of the OPS, but also had certain concerns about the logistics of the proposal including concerns about the ability of the OPS to properly complete investigations, the resources that would be available to the OPS under the reorganization, and the physical relocation of the OPS. (SAF Par. 85, 87-88); (RSF Par. 28). McLaughlin agrees that, although the reorganization plan was not proposed by him, he was involved in the discussion about the logistics of the proposal, and he prepared a report on the matter at the request of his supervisors. (SAF Par. 82); (SF Ex. 2).

McLaughlin admits that sometime after preparing his memorandum and engaging in discussions with his supervisors about the proposed reorganization, McLaughlin decided to call the Chairman to discuss the matter. (RSF Par. 30).

McLaughlin concedes that he made the telephone call to the Chairman from his own office during working hours. (RSF Par. 30). McLaughlin admits that the reason he called the Chairman was because McLaughlin was a member of the Board on which the Chairman sat. (RSF Par. 31). McLaughlin admits that his purpose for calling the Chairman was to address certain concerns about the proposed reorganization of the OPS as well as concerns relating to his own job responsibilities such as "having a secure place for his confidential files . . . and being able to meet with individuals at off hours." (RSF Par. 33). McLaughlin admits that he later described his conversation with the Chairman in a written email stating "[a]s staff to the [Board], I felt a discussion as to the effect of [the proposed reorganization] might have on my [Board] obligations was in order." (RSF Par. 46; SF Ex. 2 at 95).

With respect to McLaughlin's conversation with the Trustee, McLaughlin admits that the conversation took place at the Village police department during working hours. (RSF Par. 37). While there is a dispute between the parties regarding who initiated the conversation, the parties agree that the subject of the conversation was once again the proposal to restructure the OPS and McLaughlin's reservations about the proposal. (RSF Par. 51). By his own account, McLaughlin brought up the need for the OPS to have adequate resources both for McLaughlin to perform his job as manager of the OPS and for the OPS as a whole to perform its necessary duties. (RSF Par. 51). McLaughlin admits that he later described his encounter with the Trustee in writing as an "impromptu 5 minute conversation initiated by Trustee Dunham [which] appeared to be consistent with [the Trustee's]

regular routine which includes employee contact to keep abreast of public safety matters. . . ."  (RSF Par. 58); (SF Ex. 15).

As the above undisputed facts indicate, the evidence overwhelmingly reflects that McLaughlin was speaking as a public employee when he engaged in the speech in question and not as a private citizen.  McLaughlin was the manager of the OPS and the undisputed evidence demonstrates that he was called upon, in his official capacity as manager of the OPS, to help facilitate and discuss the proposed reorganization and expansion of the OPS.  (SAF Par. 82); (SF Ex. 2).  All of the evidence submitted by both parties establishes that the two conversations were entirely related to the future functioning of the OPS under McLaughlin, as well as McLaughlin's personal job responsibilities and resources under the proposed reorganization.  (RSF Par. 30-31, 33-34, 47, 50-51).  The undisputed evidence establishes that it was part of McLaughlin's job responsibility to be involved in such discussions and to contribute his opinion.  (SAF Par. 82); (SF Ex. 2).  Furthermore, it is undisputed that McLaughlin subsequently characterized both conversations in his own words as conversations engaged in as part of his own work responsibilities. (RSF Par. 46, 58); (SF Ex. 2, Ex. 15).  Although not dispositive to the *Garcetti* analysis, the fact that both conversations occurred during working hours in McLaughlin's professional setting also supports the conclusion that McLaughlin's speech was made pursuant to his employment duties.  *See Callahan*, 526 F.3d at 1044 (stating that "the location and audience of the employee's speech are not dispositive" to the *Garcetti* analysis).  Finally, McLaughlin has pointed to nothing in

the record to indicate his speech was motivated by anything more than his work responsibilities.

McLaughlin raises two arguments with respect to the *Garcetti* analysis in an effort to show that his speech was, in fact, protected by the First Amendment. First, McLaughlin points to a statement that the Chairman allegedly made during the telephone conversation with McLaughlin indicating that the Chairman would give his personal perspective on the proposed reorganization of the OPS as resident of the Village. Specifically, the Chairman told McLaughlin "if you're asking me to respond to your concerns, I am going to take off my hat as a member of the Board of Fire and Police Commissioners and I'm going to put my hat on as someone who lives in the Village of Schaumburg." (SAF Ex. C 19-20). However, such a statement by the Chairman is not relevant to the *Garcetti* analysis since the issue is whether McLaughlin was speaking as a citizen, not whether the Chairman was speaking as a citizen. Tellingly, McLaughlin admits that the reason he called the Chairman was because of the Chairman's position on the Board. (RSF Par. 31). The fact that the Chairman made such a statement does nothing to show that McLaughlin was speaking any less pursuant to his official duties. Even if, at one point in the conversation, the Chairman was speaking in his capacity as a resident of the Village, McLaughlin admits he could not have been speaking in a similar capacity since he was not at that time, nor had he ever been, a resident of the Village. (RSF Par. 2).

McLaughlin's second argument with respect to the *Garcetti* analysis is that *Garcetti* is not applicable since McLaughlin was not reporting to supervisors when

he engaged in the speech in question.  However, McLaughlin has cited to no authority whatsoever to support his contention that *Garcetti* should be read to apply only in cases where an employee is speaking to a supervisor.  There is no language in *Garcetti* or any subsequent Seventh Circuit decision suggesting that *Garcetti* should be read so narrowly.  In fact, Seventh Circuit precedent suggests the opposite is true.  Specifically, in *Renken v. Gregory*, 541 F.3d 769 (7th Cir. 2008), the Seventh Circuit held that *Garcetti* barred a First Amendment retaliation claim where a professor claimed he was retaliated against for lodging various complaints about the dean of students over a budget dispute.  *Id.* at 774.  Just as in this case, at least part of the speech engaged in by the plaintiff in *Renken* consisted of statements directed at those who were not the plaintiff's direct supervisors.  *Id.*  Nevertheless, the Seventh Circuit concluded that the plaintiff was clearly speaking "as a faculty employee, and not as a private citizen. . . ."  *Id.*  Also, in *Trigillo v. Snyder*, 547 F.3d 826 (7th Cir. 2008), the Seventh Circuit found that *Garcetti* barred a plaintiff's claims where the speech in question was a report about potential misconduct filed with the Illinois Attorney General by an employee of the Illinois Department of Corrections.  *Id.* at 829.  As in *Renken*, as well as the instant action, the plaintiff was not engaging in speech directed at her direct supervisors.  *Id.*

Even under McLaughlin's narrow reading of *Garcetti*, McLaughlin's argument would still fail since, even though the Chairman and the Trustee were not McLaughlin's direct supervisors, the record does establish that McLaughlin was speaking to both the Chairman and the Trustee, who he believed could influence

decisions about the reorganization. *Garcetti* stands for the proposition that statements made by public employees "pursuant to their professional duties" are not protected by the First Amendment. *Garcetti*, 547 U.S. at 421. In this case, although McLaughlin's statements were not made to his direct supervisors, the undisputed evidence shows that McLaughlin was acting pursuant to his professional duties by giving his perspective to individuals in higher authority, about the reorganization of the office that he managed. Thus, we conclude, based on the undisputed facts, that McLaughlin was speaking "pursuant to his professional duties" and that his speech was not protected by the First Amendment. *Id.*

    We note that our conclusion in this case is consistent with previous Seventh Circuit decisions that have addressed similar factual scenarios. As discussed above, this case is on point with *Renken* where the Seventh Circuit found that the district court properly awarded summary judgment for the defendants based on *Garcetti*, when a professor claimed he was retaliated against for lodging complaints regarding a dispute with the school's dean over the use of grant money. *Renken*, 541 F.3d at 774. Also, in *Sigsworth v. City of Aurora, Illinois*, 487 F.3d 506 (7th Cir. 2007), the Seventh Circuit held that a detective was acting as an investigator and member of a police task force when he reported his suspicions of misconduct within the police department and that the detective's First Amendment retaliation claim was barred under *Garcetti*. *Id.* at 510-11. The Seventh Circuit in *Sigsworth* noted that because the plaintiff's speech "was part of the tasks he was employed to perform, he spoke not as a citizen but as a public employee." *Id.* As we discussed above, the instant

action is also a case where McLaughlin engaged in speech that was a part of his official duties as the manager of the OPS. Therefore, we conclude that McLaughlin's speech was not protected by the First Amendment.

### B. Matter of Public Concern

Defendants also argue that, even if McLaughlin spoke as a private citizen and his claims were not barred under *Garcetti*, McLaughlin's speech would still not be protected since the content of the speech did not rise to a matter of public concern. *Spiegla*, 481 F.3d at 965 (indicating that under the first prong of the *Connick-Pickering* test, the plaintiff must show that he or she commented on a matter of public concern). The factors to be considered in determining whether an employee's speech is a matter of public concern are "'the content, form, and context of a given statement, as revealed by the whole record.'" *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009)(quoting *Connick v. Meyers*, 461 U.S. 138, 147-48 (1983)). Speech is not considered a matter of public concern merely because such speech is deemed "'interesting' to the community." *Colburn v. Trs. of Indiana Univ.*, 973 F.2d 581, 586 (7th Cir. 1992). Rather, courts are required to "delve deeper into the precise content, form, and context of speech that admittedly may be of some interest to the public." *Id.* We find that, even when considering the evidence in a light most favorable to McLaughlin, the undisputed evidence shows that McLaughlin's speech was not on a matter of public concern.

McLaughlin admits that some of the statements he made to the Chairman and

the Trustee related to matters specific to McLaughlin's job performance such as the availability of secure space for McLaughlin's confidential files. (RSF Par. 33). The Seventh Circuit has made it clear that "speech that serves a private or personal interest, as opposed to a public one, does not satisfy the standards for First Amendment protections." *Houskins*, 549 F.3d at 491-92. McLaughlin does point out that he raised some issues of which the public might have some interest including concerns about the proposed new location of the OPS office and the potential impact that might have on accessability for residents of the Village. However, the Seventh Circuit has stated that "'the fact that an employee speaks up on a topic that is deemed one of public import does not automatically render [his] remarks on that subject protected.'" *Cliff v. Bd. of Sch. Comm'rs,* 42 F.3d 403, 410 (7th Cir. 1994)(quoting *Smith v. Fruin*, 28 F.3d 646, 651 (7th Cir. 1994); *see also Phelan v. Cook County*, 463 F.3d 773, 791 (7th Cir. 2006)(stating that "'[t]he fact that an employee has a personal stake in the subject matter of the speech does not necessarily remove the speech from the scope of public concern'")(quoting *Button v. Kibby-Brown*, 146 F.3d 526, 529 (7th Cir. 1998)).

To withstand summary judgment, a plaintiff must point to specific statements on a "matter of political, social, or other concern to the community. . . ." *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002); *see also Nagle*, 554 F.3d at 1124 (finding that a plaintiff police officer did not show that he engaged in speech related to a matter of public concern when he offered evidence of only generalized statements at a labor management meeting relating to police manpower and safety

issues).  Not every institutional decision made by a municipal entity is an issue of public concern.  *See Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 974 (7th Cir. 2000)(stating that "if every facet of internal operations within a governmental agency were of public concern, and therefore any employee complaint or comment upon such matters constitutionally protected, no escape from judicial oversight of every governmental activity down to the smallest minutia would be possible").

The record is clear that McLaughlin's speech was either related to his own professional concerns or involved issues of public interest that did not rise to the level of public concern.  For example, McLaughlin's speech did not touch on any of the hot-button issues recognized by the Seventh Circuit, such as government waste or public safety.  *Chaklos*, 560 F.3d at 713 (finding that a letter written by plaintiffs protesting government waste was addressing a matter of public concern); *Nagle*, 554 F.3d at 1123 (noting that "statements regarding police manpower could, as a general matter, be of public concern," but also holding that "the subject matter alone does not convey constitutional protection to [the plaintiff's] statements").  The present factual scenario is precisely what the Seventh Circuit was referring to when it distinguished between matters of "public import" and matters of "public concern."  *Cliff*, 42 F.3d at 410.  For that reason also, we conclude that McLaughlin's speech was not protected by the First Amendment.

### C. Balancing of Interests

Defendants argue that even if McLaughlin could show that he was speaking as

a citizen on matters of public concern when he engaged in the speech in question, McLaughlin's speech would still not be protected under the First Amendment since the balance between the Village's interest in promoting effective public service by regulating McLaughlin's speech outweighs McLaughlin's interest in engaging in the speech. *Spiegla*, 481 F.3d at 965 (explaining the balancing of interests prong under the *Connick-Pickering* analysis).  The Seventh Circuit has indicated that "the proper balance of these competing interests is a question of law. . . ." *Chaklos*, 560 F.3d at 715.

Defendants argue that the Village had an interest in regulating McLaughlin's speech since it was important to maintain an effective chain of command in order to promote trustworthy working relationships.  Defendants point to evidence that, in taking his concerns directly to the Chairman and the Trustee without notifying his supervisors, McLaughlin violated a Village administrative protocol (Administrative Protocol).  (SF Par. 43-45).  McLaughlin admits that such an Administrative Protocol was in place at the time stating that:

> [a]ll village staff members who may have occasion to come in contact with elected or appointed officials . . . regarding questions about the operations, issues, affecting, or activities of the Village of Schaumburg shall advise . . . the Village Manager, Assistant Village Manager, Senior Assistants to the Village Manager, and the employee's supervisor and Department Director via email of this contact as soon as it is practical to do so.

(RSF Par. 43).  McLaughlin admits that such a protocol was in place "to prevent the Village Manager from being blindsided."  (RSF Par. 44).  McLaughlin also admits

that he waited six days before he informed his supervisors that he had independently contacted the Chairman. (RSF Par. 45). McLaughlin admits that he never notified his supervisors of his contact with the Trustee until he was ordered to do so. (RSF Par. 54). Additionally, Defendants offer evidence that they received conflicting reports from McLaughlin and the Trustee regarding the nature and circumstances of McLaughlin's communication with the Trustee. Specifically, Defendants point to a memorandum the Trustee wrote about the matter, in which the Trustee stated "I must now question whether Mr. McLaughlin is a truthful and ethical individual whose word can be relied upon, and I can no longer place any trust or confidence in him." (SF Par. 59); (SF Ex. 16).

Defendants argue that, based on such undisputed evidence, the Village had a valid interest in regulating McLaughlin's speech that outweighed any personal interest McLaughlin may have had in speaking. McLaughlin, on the other hand, argues that the Village had little real interest in requiring Village employees to adhere to the Administrative Protocol and the Village's interest in regulating such speech was actually quite minimal.

The Seventh Circuit has identified several factors for the courts to consider when assessing the relative interests of the parties, which include:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6)

17

whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

*Chaklos*, 560 F.3d at 714-15.  Most of these factors weigh heavily in favor of the Village's interests in this case.  There is no dispute that a policy was in place requiring employees to notify their superiors of contact with elected officials of the Village.  (RSF Par. 43).  We agree with Defendants that such a policy is useful for promoting an effective chain of command and streamlining communication between elected officials of the Village and Village employees.  *See McGreal v. Ostrov*, 368 F.3d 657, 675-76 (7th Cir. 2004)(stating that "a public employer is not required to wait until working relationships are actually damaged if immediate action might prevent the harm from occurring" and "when close working relationships are essential to fulfilling public responsibilities, deference to the employer's judgment [is] appropriate, especially in the context of the law enforcement setting").  The Village is in the best position to decide what is in the best interests of the Village and we further note that McLaughlin's contacts with the Trustee and the Chairman were not minimal or innocent and the McLaughlin, himself, has admitted that he expressed his concerns relating to the reorganization of the OPS.

It is also clear from the record that, as manager of the OPS, McLaughlin did hold a position in which personal loyalty and confidence is necessary.  In opposing summary judgment, McLaughlin argues that the Trustee's version of the precise circumstances surrounding McLaughlin's conversation with the Trustee is wrong and

argues that the court must defer to McLaughlin's version of the events. However, "[t]he key is whether the employer was acting on the facts as the employer *reasonably* found them to be." *Id.* at 680 (emphasis in original). There is no evidence to suggest that Casler and Fritz were unreasonable in believing the Trustee's version of the events when they chose to take an adverse employment action against McLaughlin.

Finally, even if McLaughlin were correct that the Village only had a minimal real interest in enforcing the Administrative Protocol and regulating the type of speech engaged in by McLaughlin, that minimal interest would still weigh in favor of the Village, since McLaughlin has pointed to no personal interest in engaging in the speech. As noted above, McLaughlin admits that he was never a resident of the Village. (RSF Par. 2). Thus, it is not likely that McLaughlin had any significant personal stake in the outcome of the proposed reorganization of the OPS. The only stake referenced by McLaughlin was a professional stake and for all the reasons stated above, McLaughlin has not shown that his speech is protected under the First Amendment.

### D. Qualified Immunity

Defendants also argue that even if McLaughlin had shown that his speech was protected under the First Amendment, Casler and Fritz would each be entitled to qualified immunity on McLaughlin's First Amendment retaliation claims against them and would still be entitled to summary judgment on those claims. Under the

doctrine of qualified immunity, government officials are "shield[ed] . . . from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Akande v. Grounds*, 555 F.3d 586, 589 (7th Cir. 2009).

At the outset, we note that Casler and Fritz are entitled to qualified immunity since, as discussed above, McLaughlin has not shown a constitutional violation. *Id.* (indicating that a plaintiff must "make out a violation of a constitutional right" in order to avoid qualified immunity); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001)(same). But even if McLaughlin had made out a violation of a constitutional right, he would have also been required to show that such a right was "'clearly established'" at the time. *Akande*, 555 F.3d at 590 (quoting *Saucier*, 533 U.S. at 201). It is the plaintiff that bears the burden of showing that a constitutional right is "clearly established" by showing that the right's "'contours [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Chaklos*, 560 F.3d at 716 (quoting in part *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *see also Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 356 (7th Cir. 2005)(indicating that the plaintiff has the burden of showing that a right is clearly established).

Seventh Circuit precedent indicates that, to the extent McLaughlin had any First Amendment rights to engage in the speech in question, such rights were not clearly established at the time, and Casler and Fritz are entitled to qualified immunity. For example, in *Chaklos*, the Seventh Circuit held that the plaintiffs' speech was protected under the First Amendment, but that the defendants who

punished plaintiffs for that speech were entitled to qualified immunity. 560 F.3d at

716. The Seventh Circuit wrote:

> [s]hould it have been sufficiently clear to defendants that they could not
> punish [plaintiffs] for their letter without violating the Constitution? We
> think not. It is clear, as plaintiffs maintain, that a public employer may
> not retaliate against an employee who exercises his First Amendment
> speech rights. . . . But, as this discussion demonstrates, the letter's
> entitlement to First Amendment protection is not obvious.

*Id.* (citations omitted). The instant action, likewise, involves a situation where

McLaughlin's entitlement to First Amendment protections at the time of the events in

question was by no means clearly established. Even if McLaughlin had a right to

take his concerns about the OPS expansion proposal directly to the Chairman and the

Trustee without promptly notifying his supervisors that he had done so, McLaughlin

has not met his burden of showing that such a right was clearly established.

Therefore, we agree with Defendants that Casler and Fritz are entitled to qualified

immunity for that reason as well. Based on all of the reasons stated above, we grant

Defendants' motion for summary judgment on McLaughlin's First Amendment

retaliation claims against Casler and Fritz.


## II. Due Process Claims Against Casler and Fritz

Defendants argue that Casler and Fritz are also entitled to summary judgment

on McLaughlin's Due Process claims for three reasons: (1) the undisputed facts

establish that McLaughlin was an at-will employee with no protectable property

interest in his position, (2) even if McLaughlin did have a protectable property interest in his employment, the undisputed facts establish that McLaughlin was provided with due process, and (3) the undisputed facts establish that Casler and Fritz are entitled to qualified immunity. In order to succeed on a procedural Due Process claim a plaintiff must show both a protectable property interest and the denial of fair process. *Belcher v. Norton*, 497 F.3d 742, 750 (7th Cir. 2007).

A. Protectable Property Interest

Defendants argue that the undisputed evidence establishes that McLaughlin was an at-will employee with no protectable property interest in his employment with the Village. The courts "look to Illinois law to determine whether [a plaintiff] had a substantive property interest in [] employment." *Rujawitz v. Martin*, 561 F.3d 685, 688 (7th Cir. 2009). In Illinois, a plaintiff "has a property interest in his job where he has a legitimate expectation of his continued employment," which a plaintiff can show by pointing to "'a specific ordinance, state law, contract or understanding limiting the ability of the a state or state entity to discharge him.'" *Id.* (quoting in part *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007)); *Miyler v. Village of East Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008). There is a "presumption in Illinois [] that employment is at-will." *Rujawitz*, 561 F.3d at 688.

McLaughlin has not pointed to any ordinance or state law that gave him a property interest in his employment with the Village. McLaughlin instead points to the Village's Police Department Policy and Procedures for Internal Investigations.

(SAF Par. 108); (SAF Ex. A). As an initial matter, the Seventh Circuit has held that "[p]rocedural guarantees, whether relied on or not, do not establish a property interest protected under the Fourteenth Amendment's Due Process Clause." *Rujawitz*, 561 F.3d at 688; *Moulon v. Vigo County*, 150 F.3d 801, 805 (7th Cir. 1998)(stating that "[t]he mere fact that an employee is entitled to a hearing before he is terminated, however, does not establish that he has a property right in his job"). Thus, McLaughlin's reliance on alleged procedural rights is insufficient to show a protectable property interest.

McLaughlin has also failed to point to evidence that would indicate that the policy provisions he cites applied to him. McLaughlin submits evidence indicating that other managers within the police department were given certain rights pursuant to police department rules, but McLaughlin admits that he was not a police officer and that he was independent of the Village police department. (SAF Par. 108); (RSF Par. 10). McLaughlin also admits that the Village's Personnel Manual, which did govern McLaughlin's employment, stated: "recognize that you have the right to terminate your employment at any time and for any reason and, of course, the Village reserves the same right. . . recognize that this manual is not an employment contract." (RSF Par 73). As a result, there is nothing in the record indicating that the position McLaughlin held other than an at-will employee and the undisputed facts show that McLaughlin had no property interest in his employment for the purposes of his Due Process claims.

B. Fair Process

Defendants argue that even if McLaughlin could show that he had a protectable property interest in his employment, Casler and Fritz would still be entitled to summary judgment on the Due Process claims since the undisputed facts demonstrate that McLaughlin was provided with fair process. The mere "'failure to conform with the procedural requirements guaranteed by state law does not by itself constitute a violation of federal due process.'" *Hudson v. City of Chicago*, 374 F.3d 554, 564 (7th Cir. 2004)(quoting *Martin v. Shawno-Gresham Sch. Dist.*, 295 F.3d 701, 706 (7th Cir. 2002)). Public employers are under an obligation to "provide certain pre-termination procedures before removing an employee" including "(1) oral and written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his side of the story." *Wainscott v. Henry*, 315 F.3d 844, 852 (7th Cir. 2003).

There is no material dispute in this case about the fact that McLaughlin did receive notice, an explanation, and an opportunity to explain his actions prior to Casler and Fritz's decision to terminate McLaughlin's employment. McLaughlin admits to the fact that, after Casler found out about McLaughlin's conversations with the Chairman and the Trustee, Casler emailed McLaughlin and asked him to provide a memorandum explaining the conversations and other relevant matters. (RSF Par. 55). Thus, the undisputed facts show that Caseler gave an opportunity to McLaughlin to give version relating to the contacts and that McLaughlin was provided with ample fair process prior to his termination. McLaughlin's argument

that he did not receive the same process as other employees or that the Village failed to follow its own policies is not sufficient to show a violation of federal due process rights. *Hudson*, 374 F.3d at 564.

Finally, Defendants have pointed to undisputed evidence that McLaughlin was given access to post-termination procedures but declined to take advantage of them. McLaughlin admits that he could have filed a grievance regarding his termination but that he did not do so. (RSF Par. 77). McLaughlin summarily argues that any grievance he would have filed would have been a sham, since the individuals considering the grievance would have been Casler and Fritz, themselves. While it is true "a hearing where the decisionmaker has prejudged the outcome does not comport with due process," McLaughlin has not shown that such was the case outside of the unsupported assertion that Casler and Fritz would not have considered his grievance. *Powers v. Richards*, 549 F.3d 505, 511-13 (7th Cir. 2008); *see also Salas v. Wisconsin Dept. of Corr.*, 493 F.3d 913, 928 (7th Cir. 2007)(holding that where a plaintiff offered no evidence to support a contention that the defendants had made up their minds prior to termination hearings, the plaintiff had not shown that the procedures were a sham). There is no evidence in the record indicating any deficiencies in the post-termination procedures available to McLaughlin, largely because McLaughlin admits he never bothered to exercise those procedures. (RSF Par. 77). Thus, even if McLaughlin did have a protectable property interest in his employment, his procedural Due Process claims against Casler and Fritz would still fail since McLaughlin has not shown that he was denied access to fair process.

C. Qualified Immunity

Defendants also argue that even if McLaughlin had successfully satisfied both elements of his procedural Due Process claims, Casler and Fritz would be entitled to qualified immunity since their actions could not possibly be said to have deprived McLaughlin of a clearly established constitutional right. *Akande*, 555 F.3d at 589. As with McLaughlin's First Amendment retaliation claims, Casler and Fritz are entitled to qualified immunity at the outset since McLaughlin failed to show an underlying constitutional violation. *Id.*; *Saucier*, 533 U.S. at 201. Furthermore, as indicated above, even if such a right were shown, it is McLaughlin's burden to show that his rights were clearly established at the time. *Kiddy-Brown*, 408 F.3d at 356. McLaughlin has failed to even address Defendants' argument that Casler and Fritz are entitled to qualified immunity on the Due Process claims and has not pointed to any facts or law that would demonstrate that McLaughlin's right to more procedural hearings than he received was clearly established. Thus, we agree with Defendants that Casler and Fritz would also be entitled to qualified immunity on McLaughlin's Due Process claims. Therefore, for all of the reasons stated above, we grant Defendants' motion for summary judgment on McLaughlin's Due Process claims against Casler and Fritz.


III. Claims Against the Village

Defendants argue that the Village is entitled to summary judgment on all remaining claims against it. McLaughlin has named the Village as a Defendant in

both of his Section 1983 claims.  There is no cause of action available against a municipality under the doctrine of *respondeat superior* and plaintiffs must proceed against a municipality in a Section 1983 *Monell* claim.  *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000).  To succeed on a *Monell* claim against a municipality, a plaintiff must establish: "(1) an express policy that, when enforced, causes a constitutional deprivation; or (2) that the constitutional injury was caused by a person with final policymaking authority."  *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008); *see also Campbell v. Miller*, 499 F.3d 711, 720 (7th Cir. 2007)(stating that for a *Monell* claim a plaintiff must show that the misconduct resulted from "'(1) the enforcement of an express policy of the City, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority'")(quoting *McCormick v. City of Chicago,* 230 F.3d 319, 324 (7th Cir. 2000)).

As we have concluded above, as a matter of law, McLaughlin has failed to show an underlying constitutional deprivation.  Without an underlying constitutional violation, McLaughlin cannot also prevail on a *Monell* claim against the Village.  *See King v. East St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007)(stating that "[i]t is well established that there can be no municipal liability based on an official policy under *Monell* if the policy did not result in a violation of [a plaintiff's] constitutional rights"); *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006)(finding that a municipality defendant cannot be liable under *Monell* for a policy or custom of inadequately training and supervising its police officers, unless

the defendant violated a constitutional guarantee). Therefore, we find that the Village is also entitled to summary judgment on McLaughlin's Section 1983 claims and we grant Defendants' motion for summary judgment on all claims against the Village.

## CONCLUSION

Based on the foregoing analysis, we grant Defendants' motion for summary judgment.

Samuel Der-Yeghiayan
United States District Court Judge

Dated:   June 8, 2009